UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

TANYA DODSON,

                           Plaintiff,

         -against-                                    6:16-CV-0597 (LEK)

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,[1]

                           Defendant.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

         This case has proceeded in accordance with General Order 18, which establishes the

procedures applicable to appeals from denials of Social Security benefits. Both parties have filed

briefs. Dkt. Nos. 14 ("Plaintiff's Brief"), 17 ("Defendant's Brief"), 20 ("Reply"). For the

following reasons, the decision of the Social Security Administration ("SSA") is vacated and this

case is remanded for further proceedings.

## II.   BACKGROUND

### A.  The Disability Allegations and Medical History

         Plaintiff Tanya Dodson was thirty-two years old on January 1, 2013, her alleged disability

onset date. Dkt. No. 8 ("Record") at 64. She is married with two children, and has a ninth grade

education. Id. at 34–35, 42. Dodson's most recent employment, as a certified nursing assistant,

ended on January 31, 2001. Id. at 42–43. As early as August 2011, and before her alleged onset

_____

         [1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of the SSA.
She replaces Carolyn W. Colvin, in her capacity as the Acting Commissioner, as defendant in
this action. Fed. R. Civ. P. 25(d).

date, Dodson received treatment from rheumatologist Dr. David Griger, who noted minimal signs of osteoarthritis from pain and tenderness in her joints. Pl.'s Br. at 2. Dodson saw rheumatologist Dr. Donald Raddatz on November 22, 2011; he noted that her past diagnoses included joint pain and fibromyalgia and suggested that her widespread pain was consistent with fibromyalgia. R. at 220–22. Dodson also received treatment for migraines before her alleged onset date from both her general practitioner, Dr. Ashly Joseph, and her neurologist, Dr. Lore Garten. Pl.'s Br. at 3. On November 16, 2012, Dr. Garten noted that medications prescribed for Dodson's migraines were initially helpful but losing efficacy and that Dodson did not wish to increase her dosage because of potential weight gain. Id.

This appeal primarily concerns Dodson's physical impairments. Administrative Law Judge ("ALJ") Arthur Patane found that Dodson's severe impairments included fibromyalgia, mild degenerative changes in the cervical and lumbar spine, and obesity. R. at 19. ALJ Patane concluded that Dodson's migraines, asthma, and other ailments were not severe and that her osteoarthritis was "nonmedically determinable." Id. The Court now turns to the record relating to Dodson's physical impairments after her alleged onset date.

On January 8, 2013, Dr. Joseph noted that Dodson suffered from daily headaches and migraines, had a small pituitary lesion found in a recent MRI, and experienced pain in her lower back and legs. Id. at 309. Dodson was taking Depakote, Maxalt, Verapamil, and Naproxen for headaches, as well as Mobic and Gabapentin for back pain, but she had declined injection therapy for her headaches as suggested by Dr. Garten because she was afraid of needles. Id. Dr. Joseph found Dodson positive for headaches, back, and abdominal pain, and negative for joint swelling and gait problems. Id. She also found tenderness and pain in Dodson's back and

assessed her with dyspepsia (from chronic nonsteroidal anti-inflammatory drugs ("NSAID") use), lower back pain, and chronic daily headaches. Id. at 310–11. Dr. Joseph altered Dodson's medications to combat her headaches and dyspepsia. Id. at 311. On February 6, 2013, Dr. Garten noted Dodson was experiencing "severe and sharp" pain on the left side of her neck and weakness in her upper extremities. Id. at 210. Dr. Garten also found Dodson had normal motor strength, coordination, and gait that day but concluded that Dodson had "probable movement disorder" that had been present for several years, and that her pain had been increasing in her neck and head. Id. A previous MRI showed straightening of the lordosis, which could be consistent with disc disease, but the brain MRI did not extend far enough to evaluate her full spine. Id.

On April 13, 2013, Dr. Joseph pointed to Dodson's MRI, which showed "degenerative changes of the cervical spine," "mild bilateral neuroforaminal stenosis," and worsening back pain. Id. at 312. Dr. Joseph also found that Dodson's headaches were no longer daily, though she continued to get headaches, have neck pain, and experience numbness in her upper extremities. Id. Dr. Joseph thus continued prescribing Gabapentin and Hydrocodone. Id. She stated that Dodson was taken off NSAIDs after listing her continuing dyspeptic and reflux issues. Id. at 315. Dr. Joseph also referred Dodson to a physical therapist for degenerative joint disease. Id.

Dr. Garten noted on April 19, 2013, that Dodson had degenerative disc disease as revealed by her MRIs and that she had neck, back, and extremity pain, including "myalgias, arthralgia, and hip pain," which medications had not abated. Id. at 202. She noted that Dodson had normal gait, coordination, and motor strength, and was awake, alert, and oriented that day.

Id. Dr. Garten also stated that Dodson "has had difficulty in using preventive medications [for her migraines] because they quickly seem to become less effective." Id.

On April 23, 2013, Dr. Garten wrote a letter concluding that Dodson was "permanently disabled from working." Id. at 242. Dr. Garten stated that Dodson had been a patient since 2010, and that she had a history of medical problems, including Von Willebrand disease, chronic migraines, neck and back pain stemming from degenerative disc disease, and polyarthralgias. Id. Dr. Garten noted that Dodson had taken many different medications for her migraines which had been unsuccessful due to tachphylaxis. Id. Dr. Garten also found that Dodson's neck and back pain as well as her migraines had only become worse over time. Id.

On April 25, 2013, Dodson saw a physical therapist on referral from Dr. Joseph. Id. at 247. The physical therapist noted that Dodson's subjective assessment was a six out of ten with constant pain, while her objective assessment indicated "maximal restriction of all movements." Id. After some decrease in pain over the course of seven visits with the physical therapist, Dodson reported a fall during her visit on May 27, 2013. Id. at 248. There had been no change in her maximal restriction diagnosis and she still had pain in her lumbar and cervical paraspinal musculature. Id.

On June 13, 2013, Dodson was seen by endocrinologist Dr. Pascale Raymond, who noted that she had "persistent dyspeptic symptoms" and had struggled to lose weight after the birth of her two children. Id. at 332. Dr. Pascale also stated that Dodson took "chronic narcotics and NSAIDS for back pain," and he noted the MRI findings discussed above pertaining to Dodson's degenerative spinal changes as well as her lingering problems with headaches and back and neck pain. Id.

On July 19, 2013, Dodson saw Dr. Garten, who noted that trials of preventive medicine for headaches, neck, and back pain were all unsuccessful. Id. at 336. Dr. Garten stated that Dodson had "musculoskeletal headaches and these are very likely triggering some of the migraines," and noted some improvement when Dodson wore a transcutaneous electrical nerve stimulation ("TENS") unit. Id. at 337.[2] Dr. Garten also stated that Dodson now found it difficult to do her household and gardening tasks as she was "unable to sit, stand, walk or even lie down for prolonged stretches of time." Id. at 336. She further noted that Dodson was, "limited in her ability to lift or carry even light amounts." Id.

On July 31, 2013, Dodson saw Dr. Emily Desantis on referral from Dr. Garten for her chronic neck pain and migraines. Id. at 258. Dr. Desantis noted that Dodson's Oswestry Disability Index[3] was sixty-four out of one hundred and that she experienced sharp, radiating pain in her head. Id. Analysis of an MRI of her spine from February 2013 reportedly showed a slight flattening of her cervical lordosis, and Dr. Desantis noted Dodson had tenderness in portions of her cervical paraspinal and upper pariscapular muscles as well as full but painful cervical range of motion. Id. at 259. Dr. Desantis noted Dodson's manual muscle testing was a five out of five in her major and minor muscle groups but that her proximal arm testing caused discomfort. Id. Dodson was recommended for injection therapy, which she received on August 5,

---

[2] A TENS unit uses two or more electrodes to "send an electrical current through the skin for pain control." Stephenson v. Colvin, No. 14-CV-8132, 2016 WL 153091, at *4 n.18 (S.D.N.Y. Jan. 12, 2016).

[3] "The Oswestry Disability Index is a condition-specific outcome measure used in the management of spinal disorders. A score between forty to sixty percent is considered a 'severe disability'. . . [a] score between 60 [and] 80 percent falls into the 'crippled' category . . . ." Pl.'s Br. at 5 n.1.

2013. Id. at 260–61. After receiving six trigger point injections, id. at 260, Dodson had a follow-up on September 4, 2013, where her Oswestry Index did not change, and Dodson stated that her TENS unit no longer reduced her headache symptoms at all, leading instead to nausea, id. at 262. Dodson also stated that her pain increased after the injections, with stabbing neck pain, low back pain exceeding a ten out of ten scale, and painful cervical range of motion. Id. Dr. Desantis noted Dodson still suffered from migraines, chronic neck pain, and occipital headaches, which were "most suspicious for myofascial etiology with postular and muscular imbalances." Id. Dr. Desantis also stated that Dodson was already taking an increased dose of Gabapentin and that there was little else she could do for Dodson, so she recommended acupuncture. Id.

On September 18, 2013, Dr. Joseph stated that Dodson had chronic myofascial pain and degenerative joint disease of the lumbar and cervical spines, and that she exhibited tenderness in the paraspinal region. Id. at 317. In her review of symptoms, Dr. Joseph also noted that Dodson was positive for neck pain, abdominal pain, and myalgias all over with use and exertion. Id. at 316. Also on September 18, 2013, Dr. Garten ordered an MRI of Dodson's cervical spine, and all findings were normal except at C4-C5 and C5-C6, where there was minimal leftward foraminal compromise. Id. at 380–81. Dr. Garten's notes also include results from an MRI of the lumbar spine revealing a "broad-based disk bulge with flattening along the anterior aspect of the thecal sac . . . [and] mild bilateral neural foraminal compromise" at L4-L5, as well as a small disc bulge at L5-S1. Id. at 378. Dr. Garten concluded that there was mild bilateral neural foraminal compromise and mild degenerative joint disease. Id. at 378–79.

On October 22, 2013, Dr. Joseph found Dodson had new and persistent right shoulder pain and noted a decreased range of motion in all directions but no tenderness, swelling, or other

signs of musculoskeletal problems in the shoulder. Id. at 319. Dr. Joseph assessed the shoulder

pain as a potential sprain or tendinitis. Id. at 320. On October 28, 2013, Dodson returned to see

Dr. Griger, who noted that she had "diffuse tenderness to palpation in a characteristic

fibromyalgic distribution." Id. at 348. After views were taken of the right shoulder and no

abnormalities were found, Dr. Griger concluded that Dodson's pain was connected to her

fibromyalgia. Id. at 348–49. On October 28, 2013, Dodson saw a physical therapist, Michael

Quinn, on a referral from Dr. Joseph and in light of her Social Security Disability application.

Id. at 350. Quinn noted that Dodson got only three to four hours of sleep a night because of her

pain, did housework only with her daughter's help, that "all motions [were] self-limited," and

that even when lifting small weights she had increased pain. Id. at 351–52. Quinn concluded that

there was "little objective evidence to support work limitations," but that her ongoing medical

and mental health conditions needed to be considered. Id. at 353.

On November 7, 2013, Dodson returned to see Dr. Garten because her headaches had not

abated. Id. Dr. Garten noted that Dodson was having difficulty doing basic tasks at home and

experienced increased pain as the Gabapentin was losing efficacy. Id. Dr. Garten also stated that

Dodson had crepitus in her joints along with paraesthesias in her arms, which was aggravated

with movement. Id. Dr. Garten also noted weaknesses in all four extremities and that Dodson

was limited in standing, walking, and sitting for prolonged periods due to her neck and back pain.

Id. In her diagnosis, Dr. Garten advised Dodson to gradually taper off Depakote for migraines

since it was ineffective, and she advised an increase of Gabapentin and Verapamil as well as a

trial of Midrin and Maxalt for migraines. Id. at 354. Dr. Garten also completed a physical

capacities evaluation form that day where she opined that Dodson was unable to sit, stand, or

walk for over thirty minutes in an eight-hour day and that she could only occasionally lift or carry less than ten pounds. Id. at 250. Dr. Garten also wrote that Dodson "has severe migraines and should not be exposed to conditions such as heat, dust, noise, cold, odors etc.," and that Dodson's back, neck, and joint pain affected her ability to do any physical work and that she had "confusion" associated with her migraines and fibromyalgia, which further limited her work ability. Id. at 251.

On November 11, 2013, Dodson saw Dr. Karl Siebuhr on a referral from Dr. Joseph for her right shoulder pain. Id. at 274. Dr. Siebuhr noted that Dodson refused to complete some of the range of motion tests, telling him she would end up "on the floor" if she did them. Id. at 278. He noted Dodson had a full range of spinal motion and pain in the strength tests, and he recommended an MRI and a "conservative treatment plan" for her right shoulder pain. Id. Dr. Siebuhr also noted that Dodson was still on multiple medications, including Tramadol, Effexor, Gabapentin, Indomethacin, and Midrin, and that she was using a TENS unit and hot and cold packs. Id. at 274–75. He also stated that she did not have numbness, weakness, or tingling in her hand or fingers, id. at 275, but he did find her positive for shortness of breath and noted her asthma symptoms were stable, id. at 278. On November 25, 2013, Dodson saw Dr. Stephanie Oceguera on referral from Dr. Joseph for a hiatal hernia. Id. at 284. Dr. Oceguera found Dodson positive for back and joint pain, and noted that she had asthma, chest pain, and shortness of breath. Id. at 287. Dr. Ocequera also stated that Dodson did not have chronic headaches and was positive for gastroesophageal reflux disease, and they discussed surgery as a future option. Id.

On February 21, 2014, Dr. Garten found that Dodson continued to have "migraine and musculoskeletal ("mixed") headaches, [and] neck pain and back pain from degenerative disc

disease." Id. at 364. Dodson was referred to a spine surgeon and for a consultation with the Albany Medical Center Headache Clinic because her headaches continued despite being at the maximum dose of Maxalt and other medications. Id. Dr. Garten recommended an increase in dosage of Indomethacin and Gabapentin as well as a migranal nasal spray. Id. A physician's assistant, Karen Kelley, saw Dodson on March 12, 2014, and Dodson stated that she had radiating pain and numbness and that her pain was better when she was lying down and worse when she was sitting, walking, standing, bending, or lifting. Id. at 365. Kelley found that she had normal strength in her lower extremities and normal spine alignment, but that she was unable to extend her back due to pain, was tender over the mid-line, and that a straight leg test produced pain on the right side of her back. Id. at 367. Kelley advised that Dodson return to the clinic as needed. Id. at 368.

On August 19, 2014, Dr. Alicia Williams saw Dodson for her acute back pain. Id. She noted that Dodson had been diagnosed with fibromyalgia, osteoarthritis, and polyarthralgia, and she found that Dodson was positive for shortness of breath, neck pain, and fatigue, but negative for myalgias, back pain, and joint swelling. Id. at 368–69. Dr. Williams also found Dodson had normal range of motion but diagnosed her with chronic neck and back pain and recommended lidocaine patches and Cymbalta. Id. at 369.

Finally, on December 5, 2014, Dr. Bernard Gussoff reviewed Dodson's medical record as a non-examining reviewing physician for her case. Pl.'s Br. at 9. Dr. Gussoff stated that Dodson could frequently lift and carry up to ten pounds, occasionally lift and carry up to twenty pounds, and could never lift or carry more than twenty-one pounds. R. at 402. Dr. Gussoff also noted that Dodson could sit, stand, and walk for one hour without interruption at one time, and that in an

eight-hour day she could sit for four hours, stand for three hours, and walk for three hours.

Id. at 403. Dr. Gussoff noted that Dodson could continuously use both her left and right hands to reach, handle, finger, feel, and push/pull, and that she could frequently use both feet to operate foot controls. Id. at 404. He stated that she could never climb ladders or scaffolds and could not kneel, crouch, or crawl, but that she could occasionally climb stairs and ramps and could balance or stoop. Id. at 405. He also noted that none of Dodson's impairments affected her vision or hearing. Id. Under the environmental limitations section, Dr. Gussoff found that Dodson could frequently move mechanical parts and occasionally operate a motor vehicle or be at unprotected heights, but that she could never be in humid, wet, dusty, odorous, extremely cold, hot, or other irritable environments. Id. at 405–06. Dr. Gussoff also stated that Dodson could handle moderate noise and do activities including shopping, traveling without a companion, walking without aide, and caring for herself. Id. at 406–07. Dr. Gussoff found Dodson had the following impairments: inflammatory arthritis supported only by subjective evidence, mild spine narrowing, Von Willebrand disease with no bleeding, asthma that was controlled, gastroesophageal reflux disease, and obesity. Id. at 408. He concluded that none of her impairments alone or combined met or were equal to the listing of impairments. Id. at 408–09.

### B. Procedural History and the SSA's Decision

Dodson applied for supplemental security income disability benefits on April 10, 2013. Dkt. No. 1 ("Complaint") ¶ 8. Dodson's claim was denied, and she appeared for a hearing before ALJ Patane on November 21, 2014. Id. ¶¶ 9–10. At the hearing, ALJ Patane and Dodson's attorney asked her about her past work experience, medical history, and daily symptoms. R. at 31–62. Dodson testified that her primary problem was fibromyalgia as diagnosed by Dr.

Griger. Id. at 40. Dodson also stated that her household switched from glass to plastic plates because the numbness and pain in her hands caused her to frequently drop and break the glassware. Id. at 45. Dodson testified that she experienced migraines three to five times a week, that they could last anywhere from one to three days, and that they were aggravated by smell, light, and noise, which led to vomiting and forced her to lie in a dark room with ice on her head. Id. at 45–46.

On February 19, 2015, Dodson's claim was denied by ALJ Patane, and Dodson's request for review by the Appeals Council was denied on March 28, 2016. Compl. ¶¶ 11–13. In his decision, ALJ Patane followed the five-step process required by the SSA to make his disability determination. R. at 14–27. At step one, ALJ Patane found that Dodson had not engaged in gainful activity since April 10, 2013. Id. at 19.

Moving to step two, ALJ Patane found that Dodson's severe impairments were fibromyalgia, mild degenerative changes to the cervical and lumbar spine, and obesity. Id. ALJ Patane also found that Dodson's asthma, migraines, Von Willebrand disease, and hiatal hiernia/esophageal reflux disease were not severe. Id. He then stated that her "[a]sthma has been controlled since 2011, migraines are not corroborated outside of subjective reports and mental status evaluations have been benign, and there is no indication of any physical limitation secondary to gastroesophageal disorder." Id. ALJ Patane also stated that "[o]steoarthritis is referenced multiple times in the record, but appears to be referenced only in relation to subjective reports from the claimant and without any supportive laboratory diagnostic studies," and he deemed this impairment nonmedically determinable. Id.

At step three, ALJ Patane found that Dodson did not have an impairment or combination of impairments meeting or equaling the severity of one of the listed impairments in the Code of Federal Regulations. Id. ALJ Patane stated that this finding was supported by the "uncontested opinion of an accepted medical source of record," namely Dr. Gussoff's assessment. Id. He also stated that, though he agreed with Dr. Gussoff's impairment findings, he gave only partial weight to his work limitations findings because Dr. Gussoff relied strongly "on claimant's subjective reports without clinical support for limitation." Id. at 19–20.

At step four, ALJ Patane found that Dodson had the residual functional capacity ("RFC") for light work. Id. at 20. He made this finding after "consider[ing] all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. 416.929 and SSRs 96-4p and 96-7p." Id. ALJ Patane also stated that he followed the required two-step process for deciding a claimant's RFC by first addressing "whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's symptoms," and then by evaluating the "intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning." Id. ALJ Patane found under step one that Dodson's impairments could reasonably have caused her alleged symptoms, but under step two he found that Dodson's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." Id. at 20–21.

ALJ Patane noted in his analysis under step one of his RFC determination that Dodson alleged a variety of symptoms, including longstanding back pain, a reliance on pain medications,

all-day pain and numbness that caused her to drop objects, an inability to lift over three pounds, and migraines three to five times a week. Id. at 20. He also stated that Dodson testified to fibromyalgia with widespread soreness, that repetitive motions bothered her, and that she could sit for only ten to fifteen minutes with burning pain. Id. He deemed these symptoms to be reasonably caused by Dodson's medical impairments. Id. Then, in his analysis for step two, ALJ Patane found that Dodson's subjective complaints lacked credibility because they were inconsistent and unsupported by "objective laboratory diagnostic studies or clinical testing." Id. at 21. He analyzed much of Dodson's medical history chronologically, stating repeatedly that the objective medical findings of the doctors and physicians who tested Dodson did not comport with their overall assessments of her impairments. Id. at 21–26. For example, ALJ Patane stated that after a February 2013 visit to Dr. Garten, Dodson

> had not had a follow-up with Dr. Radditz [sic] for official diagnosis of fibromyalgia and her reports continue to be subjective with poor support from examination notes. If the claimant had daily migraines develop some time in 2012, one wonders why she had not sought treatment for them or had any recorded emergency room visits given that she was not taking medication per subjective reports.

Id. at 22. ALJ Patane stated that there was "dissonance between subjective reports . . . especially when her consistent physical examinations were substantially within normal limits." Id. Another example of ALJ Patane finding dissonance between the doctors' assessments and Dodson's objective examinations occurred regarding Dodson's July 2013 visit to Dr. Desantis. Id. at 23. ALJ Patane stated that the MRI findings from this visit showed "mild pathology inconsistent with claimant's presentation." Id. ALJ Patane also gave "little weight" to Dr. Garten's opinions because they were "vague and wholly at odds with repeated clinical testing within normal limits,

general lack of treatment, and the second-hand reports of 'mild,' at most, pathologies on laboratory diagnostic studies not otherwise referenced in the record." Id. ALJ Patane made numerous other statements about the lack of objective evidence to corroborate the intensity and persistence of Dodson's symptoms, and he concluded that Dodson was capable of light work by affording great weight to the part of Dr. Gussoff's opinion regarding what Dodson could lift and carry. Id. at 25–26. But the ALJ "gave little weight to his opinion elsewhere . . . [because] the remainder of Dr. Gussoff's opinion is supported only if one ignores benign laboratory diagnostic and clinical testing with a poor treatment history." Id.

Lastly, at step five, ALJ Patane found that in light of Dodson's RFC, age, education, and work experience, along with his analysis of the Medical-Vocational Guidelines, Dodson was capable of a full range of light work and was therefore not disabled. Id. at 27. No vocational expert was called upon in Dodson's case, and the ALJ used the vocational guidelines because they suffice when the claimant has solely "nonexertional limitations." Id.

## III.   LEGAL STANDARD

### A.  Standard of Review

When a court reviews a final decision by the SSA, it determines whether the ALJ applied the correct legal standards and whether the decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g); Roat v. Barnhart, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)). Substantial evidence amounts to "more than a mere scintilla," and it must reasonably support the decision maker's conclusion. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The Court defers to the ALJ's decision if it is supported by substantial

evidence, "even if [the Court] might justifiably have reached a different result upon a de novo review." Sixberry v. Colvin, No. 12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). A court should not uphold the ALJ's decision when there is substantial evidence, but it is not clear that the ALJ applied the correct legal standards. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987). However, remand is unnecessary "where application of the correct legal principles to the record could lead to only one conclusion." Id. The Court may not "affirm an administrative action on grounds different from those considered by the agency." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (citing SEC v. Chenery Corp., 332 U.S. 194 (1947)).

**B. Standard for Benefits**

According to SSA regulations, disability is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). However, an individual seeking disability benefits "need not be completely helpless or unable to function." De Leon v. Sec'y of Health & Human Servs., 734 F.2d 930, 935 (2d Cir. 1984) (quoting Gold v. Sec'y of Health, Educ. & Welfare, 463 F.2d 38, 41 n.6 (2d Cir. 1972)).

In order to receive disability benefits, a claimant must satisfy the requirements set forth in the SSA's five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(1). In the first four steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)). If the SSA is able to determine that the claimant is disabled or not disabled at any step,

the evaluation ends. 20 C.F.R. § 404.1520(a)(4). Otherwise, the SSA will proceed to the next step. Id.

At step one, the SSA considers the claimant's current work activity to see if it amounts to "substantial gainful activity." Id. § 404.1520(a)(4)(i). If it does, the claimant is not disabled under SSA standards. Id. At step two, the SSA considers whether the claimant has a severe and medically determinable physical or mental impairment—or a combination of impairments that is severe—that meets the duration requirement in 20 C.F.R. § 404.1509. Id. § 404.1520(a)(4)(ii). If he or she does not have such an impairment, the claimant is not disabled under SSA standards. Id. At step three, the SSA considers the severity of the claimant's medically determinable physical or mental impairment(s) to see if it meets or equals an impairment and the requisite duration listed in 20 C.F.R. pt. 404(P), app. 1. Id. § 404.1520(a)(4)(iii). If it meets one of these listed impairments and durations, the claimant is disabled.

If, following step three, no disability determination has been made, the SSA must determine the claimant's RFC, meaning the most work the claimant is able to do given her impairments and other limitations. Id. §§ 404.1520(e), 404.1545. Then, under step four, the claimant is not disabled if the RFC reveals that the claimant can perform her past relevant work. Id. § 404.1520(a)(4)(iv). If the claimant cannot perform any past relevant work, the SSA decides at step five whether adjustments can be made to allow the claimant to work somewhere in a different capacity. Id. § 404.1520(a)(4)(v). If appropriate work does not exist, then the SSA considers the claimant to be disabled. Id.

### C. This Appeal

On May 23, 2016, Dodson initiated this appeal by filing her Complaint. Compl. In her brief, she makes four arguments as to why ALJ Patane erred in finding that she was capable of light work. First, Dodson contends that the ALJ's severity determination at step two of her overall assessment was legally erroneous because the ALJ required objective evidence of her migraines and misapplied the severity regulations by ignoring substantial evidence in the record. Pl.'s Br. at 11–12. Second, Dodson argues that ALJ Patane's RFC determination was legally erroneous because he incorrectly gave little weight to treating physician Dr. Garten's opinions and because he gave great weight to part of Dr. Gussoff's opinion but little weight to the remainder of his opinion. Id. at 13–19. Alternatively, Dodson argues that ALJ Patane "improperly substituted his opinion for that of a medical professional" because he ignored the nonexertional limitations that both Dr. Garten and Dr. Gussoff found and instead came to his own conclusions. Id. Dodson further argues that the ALJ failed to consider all of her impairments in his RFC determination. Id. at 20. Third, Dodson asserts that the ALJ's credibility determination was legally erroneous for multiple reasons, including that the ALJ frequently discounted subjective evidence and misstated the record, particularly in regard to Dodson's migraine history. Id. at 21–24. Fourth, Dodson argues that ALJ Patane's step five determination was legally erroneous because he relied on the Medical-Vocational Grids when a vocational expert's testimony should have been required. Id. at 24–25.

## IV. DISCUSSION

### A. The Severity Determination

As noted above, Dodson argues that ALJ Patane erred both by misapplying the severity regulations and by requiring objective evidence of her migraines. Id. at 12. Dodson asserts that this was a legal error because "substantial evidence . . . demonstrates Tanya's migraines should have been found to be a severe impairment as her migraines significantly limit her ability to work and can be expected to last for more than 12 months." Id. at 12–13. The Commissioner argues that the ALJ's final decision was supported by substantial evidence and that no error occurred at step two or in the sequential evaluation. Def.'s Br. at 4–7.

At the second step of the sequential evaluation process, the ALJ must decide whether the claimant has a severe impairment, defined as one that "significantly limit[s] [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a). "Basic work activities which are relevant for evaluating the severity of a physical impairment include 'physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling.'" Roat v. Barnhard, 717 F. Supp. 2d 241, 261 (N.D.N.Y. 2010) (quoting § 404.1522(b)(1)). "It is the claimant's burden to present evidence that establishes the severity of his or her impairment." Collier v. Colvin, No. 15-CV-230, 2016 WL 4400313, at *4 (W.D.N.Y. Aug. 17, 2016) (citing § 416.912(a)). "A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" Rosario v. Apfel, No. 97-CV-5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (citing Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3 (Jan. 1, 1985)). The "'mere presence of a disease or impairment, or establishing that a

18

person has been diagnosed or treated for a disease or impairment' is not, itself, sufficient to deem a condition severe." McConnell v. Astrue, No. 03-CV-521, 2008 WL 833968, at *2 (N.D.N.Y. Mar. 27, 2008) (quoting Coleman v. Shalala, 895 F. Supp. 50, 53 (S.D.N.Y. 1995)). To assess the severity of impairments, "the adjudicator must assess the impact of the combination of those impairments on the person's ability to function, rather than assess separately the contribution of each impairment to the restriction of his or her activity as if each impairment existed alone." SSR 85-28, 1985 WL 56856, at *3.

If the parties disagree about the ALJ's refusal to categorize a particular impairment as severe, the court must determine "whether there was substantial evidence to support the ALJ's conclusion that [the impairment] should not be included as a 'severe impairment.'" Hussain v. Comm'r of Soc. Sec., No. 13-CV-3691, 2014 WL 4230585, at *7 (S.D.N.Y. Aug. 27, 2014) (citing 42 U.S.C. § 405(g)), adopted by 2014 WL 5089583 (S.D.N.Y. Sept. 25, 2014). The Second Circuit has held that the step two severity analysis does no more than "screen out *de minimis* claims." Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995). Errors at step two can be harmless if the ALJ did not ultimately deny the claim solely due to the lack of a severe impairment. Tryon v. Astrue, No. 10-CV-537, 2012 WL 398952, at *3 (N.D.N.Y. Feb. 7, 2012).

The Court finds that ALJ Patane committed legal error in his severity determination because he failed to evaluate evidence of Dodson's migraines in the record and demanded objective evidence of her migraines. ALJ Patane stated in his findings that Dodson's migraines were "not corroborated and rarely complained of," R. at 24, despite multiple examples in the record where doctors listed the symptoms she endured, the medications she took for migraines, and the failure of those medications to alleviate her pain, id. at 202, 242, 250–51, 258, 260–62,

309–10, 312, 336–37, 353–54, 364. The record even reveals that Dodson initially rejected injection treatments in January 2013 because of a fear of needles, id. at 309, but agreed to receive multiple trigger point injections in August 2013, which ultimately increased her migraine pain, id. at 260. Dr. Garten, Dodson's treating neurologist, also opined on multiple occasions that medications were ineffective in treating Dodson's migraines, and Dr. Garten tried unsuccessfully to adjust medication levels to combat Dodson's symptoms. Id. at 202, 251, 353, 364. The ALJ's conclusion that Dodson's migraines were "not corroborated and rarely complained of" was patently erroneous in light of Dodson's frequent reporting and treatment for migraines.

ALJ Patane also ignored evidence in the record that Dodson's migraines limit her work ability. E.g., Id. at 45–46, 242, 250. Dr. Garten stated that Dodson's migraines were elevated by environmental factors such as light and noise, and Dodson testified to the severe, sharp pain she experienced and how migraines impacted her daily life. Id. at 45–46, 210, 251. Specifically, they forced her to lie in a dark room or to use a TENS unit, which progressively lost effectiveness after her injections from Dr. Desantis. Id. at 45–46, 262. Dodson also stated that aside from driving her children three miles to school and taking limited ten-to-fifteen minute shopping trips, she is confined to her home and cannot do normal household activities without help as a result of her migraines, fibromyalgia, and other impairments. Id. at 35, 48. The ALJ thus did not adequately consider all impairments in his step two evaluation, and "[t]he Commissioner's determination will not be upheld if it is based on an erroneous view of the law that fails to consider highly probative evidence." Warchlok v. Colvin, No. 16-CV-129, 2017 WL 585041, at *2 (W.D.N.Y. Feb. 14, 2017); see also Hernandez v. Astrue, 814 F. Supp. 2d 168, 185 (E.D.N.Y. 2011) ("The ALJ's failure to consider the effects of plaintiff's combined impairments in every

step of the five-step sequential process thus requires remand." (citing <u>Burgin v. Astrue</u>, 348 F.

App'x 646, 648 (2d Cir. 2009))); SSR 85-28, 1985 WL 56856, at *2–3 (asserting that the

severity analysis requires an evaluation of the combination of all of the claimant's impairments).

The Commissioner argues that Dodson's migraine complaints are not supported by the

record and relies on <u>Rorick v. Colvin</u> to assert that a claimant's assertions are unsupported by the

record without "persistent disorganization of motor functioning or permanent residuals as a result

of headaches or migraines." 220 F. Supp. 3d 230, 244–45 (N.D.N.Y. 2016). But <u>Rorick</u> is

distinguishable. There, the plaintiff's migraines were improved with medication, and the ALJ

accounted for migraines at each step of the process rather than erroneously stating that migraines

were rarely complained of and not corroborated. <u>Id.</u>

ALJ Patane's second error was concluding that Dodson's migraines were not severe

because they were not corroborated by clinical testing. This ignores the reality that migraines are

not easily treated or understood by doctors. <u>See</u> <u>Groff v. Comm'r of Soc. Sec.</u>, No. 05-CV-54,

2008 WL 4104689, at *7 (N.D.N.Y. Sept. 3, 2008) ("[T]o place such emphasis on the absence of

'any specific evaluation or treatment' is not only a misstatement of the medical evidence, but is

also a misreckoning of the elusive task a doctor faces in diagnosing this impairment as there

exists no objective clinical test which can corroborate the existence of migraines."). Further, the

ALJ's finding that Dodson's migraines were not severe is not supported by substantial evidence

on the record in light of the subjective evidence and doctors' opinions. <u>See</u> <u>Mnich v. Colvin</u>,

No. 14-CV-740, 2015 WL 7769236, at *21 (N.D.N.Y. Sept. 8, 2015) ("Neither the SSA nor the

courts in this Circuit have required that an impairment, including migraines, be proven through

objective clinical findings.").

ALJ Patane erred in finding that normal clinical testing created inconsistencies undermining Dodson's credibility regarding her migraines. He also erred in concluding that substantial evidence outside of subjective complaints could not be used to corroborate those complaints. Unlike cases where migraine symptoms are deemed non-severe, Dodson's doctors repeatedly noted the ineffectiveness of her medications, and Dr. Garten found that her migraines limited her ability to work. R. at 202, 210, 242, 250–51, 353, 364; see also Farrell v. Comm'r of Soc. Sec., No. 12-CV-418, 2013 WL 4455697, at *3 (N.D.N.Y. Aug. 16, 2013) (upholding the ALJ's denial of benefits where the claimant only suffered headaches two to three times a month and the medical record lacked any complaints of headaches); Bump v. Colvin, No. 13-CV-1379, 2015 WL 1472049, at *9 (N.D.N.Y. Mar. 31, 2015) (affirming denial because the plaintiff's migraines were controlled with medicine and did not limit daily tasks). ALJ Patane gave little weight to the limitations that Dr. Garten placed on Dodson, again because he found the record devoid of migraine complaints and he rejected all subjective evidence. R. at 21–24. Cf. Ramsay v. Colvin, No. 12-CV-0506, 2013 WL 2359004, at *7–8 (N.D.N.Y. May 29, 2013) (Kahn, J.) (affirming ALJ determination that the plaintiff's migraines were not severe because no medical source found limitations to the plaintiff's work-related activities and evidence in the record showed that the plaintiff went about daily activities and controlled her migraines with medication); Oakes v. Colvin, No. 13-CV-1374, 2015 WL 1959681, at *5 (N.D.N.Y. Apr. 29, 2015) (Kahn, J.) (affirming ALJ's denial of benefits after considering evidence in the record of the plaintiff's migraines at every step and finding the plaintiff only took one medication and had no doctor's statements about the limiting effects of migraines). Here, Dodson's treating neurologist, Dr. Garten, concluded that Dodson should not be exposed to conditions including

heat, dust, or noise in light of her persistent migraines and the failure of medication to alleviate them. R. at 251. ALJ Patane justified downgrading Dr. Garten's opinions because he mistakenly found that Dodson rarely complained of migraines and that all of Dodson's normal clinical testing created inconsistencies with the subjective evidence. Id. at 23.

There is no merit to the Commissioner's argument that any errors at step two regarding Dodson's migraine evaluation were harmless. A finding of harmless error "is appropriate only when it is clear that the ALJ considered the claimant's headaches and their effect on his or her ability to work during the balance of the sequential evaluation process." Zenzel v. Astrue, 993 F. Supp. 2d 146, 153–54 (N.D.N.Y. 2012) (Kahn, J.). ALJ Patane failed at each step of the analysis to properly consider the evidence regarding Dodson's migraine treatment. On remand, all of Dodson's impairments, including the impact of her migraines on her ability to work, must be evaluated as required by the SSA regulations. SSR 85-28, 1985 WL 56856, at *3. ALJ Patane's failure to evaluate Dodson's migraines and his demand for objective evidence are legal errors warranting remand.

### B. Dodson's Remaining Arguments

The Court cannot fully evaluate Dodson's other arguments because the error at step two taints the ALJ's remaining determinations. See Groff, 2008 WL 4104689, at *12 ("Because of the errors committed by the ALJ at Step Two and because of his inadequate RFC determination, we cannot complete our review of Steps Four and Five, as any determinations beyond the RFC were necessarily tainted."); Beagle v. Comm'r of Soc. Sec., No. 14-CV-769, 2015 WL 8347161, at *8 (N.D.N.Y. Dec. 8, 2015) (remanding because substantial evidence in the record did not support the ALJ's conclusions at step two and tainted the entire analysis). Because the ALJ failed

to evaluate Dodson's migraines properly as one of her impairments and since a proper evaluation could change the outcome of the RFC, credibility, or vocational determinations, the Court cannot adequately address Dodson's arguments about those findings. See Campbell v. Colvin, No. 13-CV-451, 2015 WL 73763, at *12 (N.D.N.Y. Jan. 6, 2015) ("The errors identified above were not harmless. They deprived Campbell of a substantial right to have her claim adjudicated according to correct principles of law. Nor can a reviewing court conclude that the result would have been the same absent these errors."). This is true whether Dodson's migraines are ultimately deemed severe or not severe on remand, because the ALJ must analyze all of her impairments in each step. SSR 85-28, 1985 WL 56856, at *3.

The Court is troubled by the ALJ's substitution of his own medical opinion for those of Dodson's doctors. Despite Dr. Garten's extensive treatment history with Dodson, the ALJ rejected her opinions as "almost entirely based upon the claimant's subjective reports." R. at 23. But an ALJ cannot substitute his or her own lay opinion for that of an acceptable medical source, and considering the nature of migraines, ALJ Patane was not entitled to reject the doctors' opinions solely because they considered subjective evidence. Labarge v. Colvin, No. 15-CV-732, 2016 WL 5408160, at *5 (N.D.N.Y. Sept. 28, 2016) (citing Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015)). If the ALJ had questions about the limitations Dr. Garten identified as resulting from Dodson's migraines, he should have contacted her for clarification. See id. (explaining that a doctor may need to be re-contacted for more information on the limitations of migraines). When re-evaluating Dodson's case, the ALJ should be mindful of his duty to re-contact doctors and to adequately justify giving lesser weight to their opinions. See Walsh v. Colvin, No. 13-CV-603, 2014 WL 4966142, at *9 (N.D.N.Y. Sept. 30, 2014) (noting that an ALJ may

not cherry-pick the evidence that supports their conclusions and ignore contrary evidence). On remand, the ALJ must analyze the impact of Dodson's migraines and their limiting effect on her work capabilities at each step of the sequential process.

## V.	CONCLUSION

Accordingly, it is hereby:

**ORDERED,** that the decision of the Commissioner is **VACATED and REMANDED** for further proceedings consistent with this Memorandum-Decision and Order; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:	June 30, 2017
	Albany, New York

Lawrence E. Kahn
U.S. District Judge